UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KATHLEEN J. ALGARIN,

                          Plaintiff

                                                                  DECISION AND ORDER

-vs-

                                                                   06-CV-6064 CJS

JO ANNE B. BARNHART,
Commissioner of Social Security,

                          Defendant.

_____

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Jere B. Fletcher, Esq.<br>P.O. Box 93031<br>Rochester, New York 14692 |
| For the Defendant: | Terrance P. Flynn, Esq.<br>United States Attorney for the<br>Western District of New York<br>Brian M. McCarthy, Esq.<br>Assistant United States Attorney<br>100 State Street<br>Rochester, New York 14614 |

INTRODUCTION

      This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner"), which denied plaintiff's application for disability insurance benefits. Now before the Court is plaintiff's motion for judgment on the pleadings [#6] and defendant's cross-motion for an order remanding the matter for a new hearing [#9]. For the reasons stated below,

1

defendant's application is denied, plaintiff's application is granted, and this matter is remanded to the Commissioner solely for the calculation of benefits.

## PROCEDURAL HISTORY

Plaintiff applied for disability benefits on or about February 2, 2003, claiming to be disabled due to carpal tunnel syndrome. (76). Plaintiff stated that she had been unable to work since August 13, 2001. (84). Plaintiff indicated that prior to developing carpal tunnel syndrome, she had worked in retail sales, as a sales associate, money counter, and store manager, and had also worked in a manufacturing plant applying lacquer to optical products. This latter position apparently required extensive repetitive use of her hands. (103). Both jobs required lifting up to fifty pounds, and frequent lifting of up to 25 pounds. (97-98). The Commissioner denied plaintiff's claim on August 21, 2003, finding that plaintiff was capable of performing light work. (65-68). A hearing was held before an Administrative Law Judge ("ALJ") on January 25, 2005. After the hearing the ALJ issued a decision denying benefits. (34-46). Plaintiff appealed to the Appeals Council and submitted additional medical evidence, however, the Appeals Council denied review on December 19, 2005, without making any mention of the additional medical information. (4-6).

## MEDICAL EVIDENCE

Plaintiff began treating with hand surgeon Vincent Reale, M.D. ("Reale") after she began complaining of bilateral wrist pain. Reale diagnosed bilateral carpal tunnel syndrome, and performed surgery to relieve plaintiff's right carpal tunnel condition on August 13, 2001. The surgery appeared to be successful, however, shortly thereafter plaintiff began to experience pain at the site of her incision. Reale noted, on

September 14, 2001, that plaintiff's pain was increasing, and he referred her for physical therapy. (182)[1]. Reale examined plaintiff again on January 17, 2002, and noted that plaintiff "seem[ed] worse since her last visit." (181). Reale observed that plaintiff's scar was "more tender," and that her grip strength in both hands was "obviously very poor." (*Id*.). Reale gave plaintiff a nerve-block injection, but this had very little effect.

Jeffrey Fink, M.D. ("Fink"), another hand surgeon, examined plaintiff on February 8, 2002, upon a referral from Dr. Reale, for a second opinion. Fink noted that plaintiff's right wrist scar was "very sensitive to palpation, even to light touch," and he agreed that plaintiff was likely suffering from nerve problems following her carpal tunnel surgery. Fink recommended medication for the discomfort, and stated that surgery was an option if the pain continued. (131-32).

Satish Acharya, M.D. ("Acharya"), of the GVA Pain Management Center, reported on May 5, 2002, that he had attempted various types of nerve blocks on plaintiff to alleviate her right wrist/hand pain, without success. (133). Reale performed a second surgery on plaintiff's right wrist on August 16, 2002, to address "chronic problems with pain in the carpal tunnel release scar." (176). Reale wrote:

> Since her prior operation, she has hall all types of studies done, including nerve blocks, both by myself and by the Pain Center. These blocks did not seem to relieve the pain in her scar. She also had steroid injections with Kenalog-10 and -40, which did not improve the situation.

(176).

Roy Hepner, M.D. ("Hepner"), a state-agency examining physician, examined

---

[1]Unless otherwise noted, citations are to the administrative record.

plaintiff on November 5, 2002. (140-42).  Hepner noted that plaintiff had a reduced range of motion in her right hand and wrist, and was "very tender" over her scar, and had essentially normal range of movement in her left hand and wrist. (142).  Hepner opined that plaintiff should not use her right hand except as a "helper limb." (140).

Linda Fisher, OTR, CHT ("Fisher"), an occupational therapist, examined plaintiff on January 29, 2003 and January 31, 2003, at the request of the New York State Insurance Fund. (143-48).  Fisher noted that plaintiff complained of pain after "grasping and lifting 5 lbs. repeatedly," and that "accidental bumping of scar causes patient to drop objects." (144).  Fisher stated that plaintiff had limited grip strength bilaterally, "significantly slow" fingering, and "significantly impaired" "reaching and torquing" ability. (146).  Fisher stated that plaintiff could lift and carry up to 15-24 pounds "depending upon the shape and placement of the object to be moved." (146).  Fisher wrote: "Fingering and handling tasks are feasible, as long as they are not repetitious or of more than 20 minutes duration. . . . Client would not be successful in returning to work in a job classification requiring light, bimanual tasks of more than 20 minutes duration." (*Id.*).

Jeffrey Jones, M.D. ("Jones") a private physician, examined plaintiff on a consultative basis on February 5, 2003. (167-69).  Jones's impression was: "1. Bilateral carpal tunnel syndrome status post release on the right complicated by development of palmar sensory branch neuroma with probable ongoing chronic low-grade RSD [Reflex Sympathetic Dystrophy][23] type picture.  2. Left sided carpal tunnel syndrome." (168).

---

[2] "Reflex Sympathetic Dystrophy Syndrome (RSD) - also known as Complex Regional Pain Syndrome (CRPS) - is a chronic neurological syndrome characterized by:

Jones stated that plaintiff ought to have surgery to correct her left-side carpal tunnel, but that such surgery should wait until plaintiff's problems with her right wrist were resolved. As for the right side, Jones concluded that surgery would be necessary to correct the apparent neurological problem, though such surgery would probably leave plaintiff with an area of permanent numbness in her right hand. (168).

Reale operated on plaintiff's right wrist a third time on April 11, 2003, in an attempt to relieve her wrist pain. (171). Following the surgery, Reale opined that there was a "somewhat guarded prognosis as to whether the chronic pain will be relieved." (*Id*.).

Ramon Medalle, M.D. ("Medalle"), a non-treating physician, performed an independent medical examination on July 24, 2003. (184-87). Medalle noted that plaintiff was currently taking Ambien, Hydrocodone [Vicodin] and Naprosyn. (184). Medalle reported that plaintiff claimed to be able to cook, clean, do laundry, and go grocery shopping, but that she needed assistance with all of those tasks. (185). Medalle stated that, upon examination, plaintiff had "difficulty using the hands," and that it took her longer to do things such as picking up small objects with her right hand than with her left. Medalle's diagnosis was: "Carpal tunnel syndrome, status post carpal

---

* severe burning pain
* pathological changes in bone and skin
* excessive sweating
* tissue swelling
* extreme sensitivity to touch

(Reflect Sympathetic Dystrophy Association Website, http://www.rsds.org/2/what_is_rsd_crps/index.html).

[3]The term "sympathetic" refers to the sympathetic nervous system, which is "the part of the autonomic nervous system that is concerned esp. with preparing the body to react to situations of stress or emergency." MERRIAM WEBSTER'S MEDICAL DICTIONARY (1993).

tunnel release surgery on the right with development of hyperesthesia[4] and dyesthesia[5] as well as exacerbation of the pain." (187). Medalle further concluded that plaintiff was "moderately limited in activities requiring repetitive use of both hands, especially the right." (*Id.*).

A non-treating, non-examining agency review consultant, whose name and qualifications are unknown to the Court[6], completed an RFC assessment on August 18, 2003. (188-93). The review consultant stated that plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently, was able to stand/walk for six hours in an eight-hour workday, and sit for six hours. (189). The report further indicated that plaintiff was limited in her ability to push and/or pull with both hands, and in her ability to handle and finger with her right hand. (190).

Allan Pettee, M.D. ("Pettee"), a treating neurologist, examined plaintiff on August 19, 2003, and performed nerve conduction studies. (194-97). Pettee stated that the nerve conduction studies showed "mild residual right carpal tunnel syndrome," and mild carpal tunnel syndrome on the left. (197). Pettee opined that the right carpal tunnel had been "successfully decompressed," but that plaintiff had "residual neuropathic symptoms . . . perhaps she will require further chronic pain management for her

---

[4] Hyperesthesia is an "unusual or pathological sensitivity of the skin or of a particular sense to stimulation." MERRIAM WEBSTER'S MEDICAL DESK DICTIONARY 312 (1993).

[5] Dysesthesia is "an impairment of sensitivity esp. to touch." MERRIAM WEBSTER'S MEDICAL DESK DICTIONARY 196 (1993).

[6] The signature on the form is illegible. The Court notes that neither the ALJ nor the person who compiled the administrative record on appeal was apparently able to discern the name of the review consultant. (*See*, 2, 43). Moreover, it is unclear whether the person who completed the report is a medical doctor.

neuropathic discomfort." (*Id.*).

Sarah Nemetz, M.D. ("Nemetz"), plaintiff's primary care physician, wrote on February 23, 2004, that plaintiff was complaining of pain in both arms and both elbows, as well as pain in both wrists. (238). Nemetz noted that plaintiff was using a wrist splint as well as a "lidoderm patch," for her right wrist. (238).

Reale examined plaintiff on February 26, 2004, and reported that "[t]here has not been any significant improvement from her visit to the Pain Clinic." (202). Reale further stated:

> Besides her right hand symptoms she has developed achiness in both her forearms and also to a lesser extent in her thighs. Her medical physician, Dr. Sarah Nemetz, feels that this may be secondary to her chronic pain syndrome. I think this is certainly a possibility. Dr. Nemetz would like her to see a rheumatologist and I think that is reasonable.

(*Id.*).

Nemetz wrote on March 1, 2004, that plaintiff was complaining as follows: "Both arms and entire back are achy and sore. Some days legs too but mostly the upper body. Ambien helps her to sleep for the most part. Wakes up often . . . tired in A.M." (236).

Hepner examined plaintiff again on March 1, 2004, at the request of the State Insurance Fund. (223-26). Hepner noted that plaintiff was wearing a right wrist splint and a medication patch on her right forearm. Hepner stated:

> I do not feel this patient has a reflex sympathetic dystrophy. The multitude of diffuse symptoms to include upper back and lower back cannot be attributed to work activities, nor can a diffuse bilateral upper extremity tenderness. This presentation strongly suggests a diagnosis of underlying disease and I would recommend obtaining a rheumatoid screen if such testing has not already been performed.

(224). Hepner indicated that plaintiff reported taking Vicodin three times per day for pain, as well as Ambien and Anaprox. (*Id*.). Plaintiff also reported feeling as though she were experiencing "flu symptoms," as well as pain in both elbows. (*Id*.).

Nemetz wrote on April 1, 2004, that plaintiff reported having "more bad days than good." (234). Nemetz stated that plaintiff had "multiple tender points[.] Tender points also [at] lat shoulders [and] at both epicondyles." (235). Nemetz's impression was "fibromyalgia syndrome suspected possibly brought on by her chronic pain syndrome." (*Id*.).

Nemetz subsequently reported on May 6, 2004, that plaintiff was having "no real improvement" of her pain symptoms from taking Nortriptyline. Plaintiff also reported feeling "achy all over" twice a month. (232). Nemetz's impression was "chronic pain syndrome including suspected fibromyalgia." (232-33).

Roger Cass, M.D. ("Cass"), a rheumatologist, examined plaintiff at Nemetz's request on December 16, 2004. After his examination of plaintiff, Cass wrote to Nemetz, in relevant part: "I agree with your diagnosis and treatment. She was instructed in progressive exercise and referred to a fibromyalgia clinic. She will return to you for a medical follow up. Other therapeutic options are amitriptyline or Trazadone hs." (242).

Reale completed an RFC assessment on March 22, 2005, in which he stated that plaintiff was totally precluded from using her right hand to work. (27).

Nemetz reported on March 10, 2005, that plaintiff was complaining of lower back pain whenever she stood for more than ten minutes. (25). Plaintiff described the pain as "nauseating." Nemetz subsequently issued a detailed RFC assessment (12-16) on

August 9, 2005, in which she concluded that due to fibromyalgia, bilateral carpal tunnel syndrome, and epicondylitis [tennis elbow], plaintiff was able to sit, stand, and walk for only "0-1" hours per day, and that, in a work environment, plaintiff would need to be able to change positions at will, and to take a 15 minute break every hour, during which she would need to lie down. (14-15).  Nemetz further stated that plaintiff could "rarely" lift 5 pounds, should "never" lift more than 5 pounds, and should perform no repetitive movements with either hand.[7] (16).  Nemetz also opined that plaintiff's condition "frequently" interfered with her attention and ability to concentrate, that her medications caused drowsiness, and that plaintiff would likely miss "more than four days per month" from work due to her condition. (14, 16).

Louis Catapano, D.C. ("Catapano"), a treating chiropractor, issued an RFC assessment on August 19, 2005, that essentially mirrored Nemetz's report, insofar as it pertained to lifting, sitting, standing, and walking. (17).

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

---

[7]To be precise, Nemetz actually stated that plaintiff could perform repetitive movements with her left hand for 1% of a workday.

support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the defendant may carry its burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then defendant cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or

perform."[8] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[9]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling.  And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

## THE ALJ'S DECISION

In the hearing before the ALJ, plaintiff testified that she was fifty years old and had a high school education.  She indicated that she suffered from pain in her right wrist and hand, where she previously had surgery. (248).  She stated that her right wrist and palm were so sensitive that she could not tolerate anything touching them.  She

---

[8]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[9]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

also indicated that she had pain in her right arm that extended into the right side of her back. (*Id.*). Plaintiff stated that because of that, she tended to use her left hand more than her dominant right hand. (249). However, she stated that she experienced "throbbing" in her left wrist and hand following activities such as "picking up even just little bags with groceries in them." (*Id.*). However, she also stated that her left hand would begin to feel "fatigued and achy" if unused "for a long period of time." (253). Plaintiff testified that she could not hold a telephone in either hand for longer than 5 minutes without experiencing pain. (254). She further testified that she had pain in her upper left arm and back, which prevented her from raising her arm above chest level. (*Id.*). Plaintiff stated that she felt right-sided lower back pain if she stood longer than 15 minutes in one place, sat more than 30 minutes, or walked longer than 30 minutes. (251-52). She additionally stated that she suffered from "flu-like symptoms" which she attributed to Fibromyalgia. (253). As to that, she testified that, "about once a month it feels like I'm coming down with the flu." (*Id.*). Plaintiff testified that she was able to drive for short distances, do some shopping, and help with folding laundry for short periods, but that she needed her husband's assistance with these activities. (255). For example, she stated that when shopping, her husband had to carry the bags of groceries. (*Id.*). Plaintiff stated that she could not vacuum the house, though she could do light dusting for ten to fifteen minutes. (*Id.*). Plaintiff indicated that she was able to lift a gallon of milk with her left hand, but was not able to open jars or do other things such as peeling or slicing vegetables. (256-57). Plaintiff stated that she was unable to use a computer because of difficulty using her hands and because her medication

made her dizzy. (261).  She stated that she took the pain-killer Vicodin two to three times per day and the sleep-aid Ambien at bedtime. (262).  She stated that the Vicodin made her feel clumsy and drowsy. (*Id*.).

Following the plaintiff's testimony at the hearing, the ALJ posed various questions to a vocational expert ("VE").  The ALJ began by asking the VE to review three job listing from the Dictionary of Occupational Titles, namely "Radio/TV Page, DOT number 353.367-022, a recreation and amusement functioner, 344.677-014 and hostess, amusement/recreation, 349.667-014." (275).  The ALJ then asked the VE a series of questions regarding these positions.  For example, the ALJ asked about the requirements for repetitive hand use for these positions, and the VE noted that the hostess position required "frequent" reaching and handling, while the usher and page positions required "occasional" reaching, handling, and fingering. (288).  However, the ALJ never specifically asked the VE whether plaintiff could perform those positions, and the VE never stated that plaintiff could.  Plaintiff's counsel then attempted to ask the VE a detailed hypothetical question incorporating plaintiff's claimed limitations, including her alleged drowsiness from taking pain medication. (286-87).  The ALJ interrupted counsel and essentially prevented him from finishing his question. (287).  Nonetheless, the VE responded that plaintiff's claimed limitations, as framed by counsel in his hypothetical, would prevent plaintiff from working on a sustained basis:

> [J]ust based in [sic] the decreased level of concentration and the, [sic] with increased activity results in increasing pain with the hands after one hour of any activity, based on that an individual might be able to get hired into the position but wouldn't be able to maintain the position for longevity because they would be unable to meet employer's expectations in order to complete demands in a timely fashion.

(288).

At the first step of the five-step sequential analysis described above, the ALJ found that plaintiff was not engaged in substantial gainful employment. (36). At the second step of the analysis, the ALJ found that plaintiff had two severe impairments, namely, bilateral carpal tunnel syndrome and fibromyalgia. (37). At the third step of the sequential analysis, the ALJ found that plaintiff's "severe impairments" did not meet or equal the criteria of any impairment(s) listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("the Listings")(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

The Court pauses here to note that, in making that finding, the ALJ questioned the diagnosis of fibromyalgia made by doctors Nemetz and Cass, calling it "a rather questionable diagnosis." (37). However, it is well settled that

> the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him.

*Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (citation and internal quotations omitted). Here, there was no substantial medical evidence to controvert the opinions of Nemetz or Cass. Nonetheless, the ALJ concluded that Dr. Nemetz's diagnosis was inconsistent with "the American College of Rheumatology's established criteria for fibromyalgia syndrome," since her notes did not indicate the specific number of tender points found on examination. (37). The ALJ also questioned how Cass could have made a diagnosis of fibromyalgia, since Cass's notes, as interpreted by the ALJ, listed "dermatitis" and "normal joints" as the only findings made by Cass during his

examination of plaintiff. The ALJ's statement in this regard was itself "rather questionable," however, since Cass, a Rheumatologist, expressly stated that he agreed with Nemetz's diagnosis of fibromyalgia. Presumably, Cass made other findings not expressly set forth in his letter, since it would be inconceivable that a medical doctor would confirm a diagnosis of fibromyalgia based only upon findings of dermatitis and normal joints. Moreover, if the ALJ had doubts or questions about the fibromyalgia diagnosis, he should have attempted, in the first instance, to develop the record further by seeking clarification from Nemetz and Cass. In that regard, the Court notes that, subsequent to the hearing before the ALJ, Nemetz prepared a report in which she explained that her diagnosis was based, in part, on her finding "pain in at least 11/18 tender points." (13).

Proceeding to the fourth step of the sequential analysis, the ALJ found that plaintiff did not have the RFC necessary to perform her past relevant work. Specifically, the ALJ found:

> Based on the overall evidence of record and having given consideration of the nominal effects of mild to moderate right arm/wrist pain, the undersigned finds the claimant retains the residual functional capacity to perform the exertional requirements of work that requires lifting, carrying or pushing/pulling no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. She is capable of standing and/or walking at least six hours out of eight. She can perform jobs that require no repetitive use or fine finger manipulation of either hand, but she is capable of occasional reaching, feeling, handling, and fingering. [The] claimant is capable of performing this level of work activity on a sustained basis. Light work, as defined in the regulations, involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, and individual must have the

>ability to do substantially all of these activities.  If someone can do light work, we determine that he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods.  The combined effects of the claimant's exertional (lifting, carrying, pushing/pulling) limitations and non-exertional manipulative limitations and restrictions significantly erode the full range of light work.  However, her residual function [sic] capacity, as described above, allows the claimant to avoid those activities which might tend to aggravate her symptomatology, and further gives her the benefit of doubt as to her complaints of not being able to stand or sit.  This residual functional capacity is also consistent with the results of the independent functional capacity evaluation in January 2003.

(43-44).

In making this RFC determination, the ALJ rejected much of plaintiff's testimony, finding her "not entirely credible." (43).  For example, the ALJ apparently rejected entirely plaintiff's testimony concerning the side effects of her pain medication, since he did not include her alleged daytime drowsiness as a non-exertional impairment. (43). Apparently relying once again on his own medical knowledge, the ALJ also stated that, "[e]ven if the claimant were having side effects of her medication, there is no reason to believe that such effects would not be alleviated by a change or modification in those medications."[10] (42).  Similarly, the ALJ rejected plaintiff's testimony regarding her restricted ability to sit and stand.  In that regard, it is unclear how the ALJ believed that he was giving plaintiff "the benefit of doubt as to her complaints of not being able to stand or sit" (43-44), since, as discussed earlier, she testified that she could not stand longer than 15 minutes in one place, or sit longer than 30 minutes, without experiencing pain. (251-52).  Significantly, in formulating this RFC, the ALJ "afforded significant

---

[10]Again, if the ALJ had a question regarding plaintiff's medications, he should have developed the record further by seeking a clarification from a medical expert.

weight" to the opinion of the anonymous review consultant written on August 18, 2003. (43). In any event, the ALJ concluded, at the fourth step of the sequential analysis, that plaintiff was not able to perform her past relevant work.

The burden then shifted to the Commissioner at the fifth step of the sequential analysis to establish that plaintiff was capable of performing "any other work." At this step, the ALJ concluded, purportedly based on the testimony of the VE, that plaintiff was capable of performing at least two jobs in the national economy, namely, that of a "page," and that of an "usher."[11] In that regard, the ALJ wrote: "The vocational expert testified that assuming the claimant's specific work restrictions, she is capable of making a vocational adjustment to work as a page, of which there are 610 positions existing in the local economy in which the claimant resides, 120,000 nationwide; and usher (240/36,000)." (45). Again, however, the Court does not read the VE's testimony to expressly state that plaintiff was capable of performing either job. Nonetheless, based upon these findings, the ALJ found that plaintiff was not disabled.

Plaintiff subsequently appealed to the Appeals Council on August 20, 2005. (7-20). In support of that application, plaintiff submitted additional medical evidence gathered subsequent to the hearing, namely, the RFC assessment completed by Nemetz on August 9, 2005 (12-16), and the RFC assessment by Catapano dated August 19, 2005. (17-20).

---

[11]The VE testified that the positions of "page" and "usher" required "occasional reaching, handling and fingering." (288). "Occasionally" means occurring from very little up to one- third of the time, and would generally total no more than about 2 hours of an 8-hour workday." SSR 96-9p, 1996 WL 374185 at *3 (Jul. 2, 1996). Accordingly, the VE testified that these two positions would require plaintiff to reach, handle, and finger for up to two hours per day.

ANALYSIS

The parties in this case maintain that the case should be reversed and remanded, because of errors committed by the ALJ, and the Court agrees. Without going into unnecessary detail, the Court notes that the ALJ appears to have given very little weight to the opinions of plaintiff's treating physicians, while giving "significant weight" to the opinion of the unnamed review consultant. This was error. The Court notes that the review consultant's report did not even mention the diagnosis of fibromyalgia. In short, the Court does not consider the report of the review consultant to constitute substantial evidence. On the other hand, the opinions of plaintiff's treating physicians, which are consistent, and especially those of Dr. Nemetz, indicate that plaintiff is not able to work. Moreover, in response to a hypothetical question incorporating plaintiff's exertional and non-exertional limitations, the VE indicated that plaintiff would not be able to work on a sustained basis.

The only remaining issue for the Court to decide is whether the case should be remanded for further administrative proceedings, or whether it should be remanded solely for the calculation of benefits. The Second Circuit has stated that,

> [u]pon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, we generally vacate and instruct the district court to remand the matter to the Commissioner for further consideration. Where, however, the reversal is based solely on the Commissioner's failure to sustain his burden of adducing evidence of the claimant's capability of gainful employment and the Commissioner's finding that the claimant can engage in . . . work is not supported by substantial evidence, no purpose would be served by our remanding the case for rehearing.

*Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000) (citations and internal quotation marks omitted); *Butts v. Barnhart*, 388 F.3d 377, 385-87 (2d Cir. 2004) ("[W]hen further

findings would so plainly help to assure the proper disposition of the claim, we believe that remand is particularly appropriate. On the other hand, where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.") (citations and internal quotation marks omitted). In the instant case, the Court has carefully reviewed the entire record, and finds no substantial evidence to refute the opinions of plaintiff's treating physicians. Nor does the Court believe that further development of the record is needed. As to that, defendant contends that "further testimony from the VE may well reveal that the jobs of usher and page are consistent with the residual functional capacity ultimately found by the ALJ." (Def. Memo p. 7). However, such additional testimony by the VE would be pointless, since, as already explained, there is no substantial evidence of record to support the ALJ's RFC assessment. Consequently, remand for calculation of benefits is appropriate.

## CONCLUSION

For the reasons discussed above, defendant's application [#9] is denied, plaintiff's application [#6] is granted, and this matter is remanded to the Commissioner solely for the calculation of benefits.

So Ordered.

Dated: Rochester, New York
       January 25, 2007

ENTER:

 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge